510 So.2d 1282 (1987)
WALSH BROS., et. al., Plaintiffs-Appellants,
v.
CELERON CORPORATION (Now Louisiana Intrastate Gas Corporation), Defendant-Appellee.
No. 86-611.
Court of Appeal of Louisiana, Third Circuit.
June 17, 1987.
Writ Denied October 9, 1987.
*1283 Ray A. Barlow and Scott C. Sinclair, of Hargrove, Guyton, Shreveport, Gold, Simon, Charles S. Weems, III, Alexandria, for plaintiffs-appellants.
Lawrence E. Donohoe, Jr. and Randall C. Songy, of Onebane and Associates, Lafayette, Provosty, Sadler, etc., Ledoux R. Provosty, Jr., Alexandria, for defendant-appellee.
Before DOMENGEAUX, DOUCET and KNOLL, JJ.
KNOLL, Judge.
Walsh Brothers-Gahagan, Ltd., Sawyer Drilling & Service, Inc., Succession of John B. Atkins, Harry M. Jarred, Caroline A. Crawford and W.J. Atkins (collectively referred to as Walsh) appeal the trial court's judgment granting Louisiana Intrastate Gas Corporation's (LIG) motion for summary judgment declaring a 1974 gas purchase contract between the parties terminated on *1284 January 1, 1985, for lack of a certain and definite price. The sole assignment of error is that the trial court erred in its determination that after January 1, 1985, a certain, definite price payable by LIG to Walsh under the gas purchase contract could not be ascertained and therefore the contract could no longer be enforced. We reverse and remand.

FACTS
Through a written contract effective May 1, 1974, Walsh agreed to sell specified amounts of natural gas from lands in Red River Parish to LIG for a ten year term.
Pursuant to the provisions of the contract the parties redetermined the contract price in 1975, 1977 and 1979, and amended the contract accordingly. The last contract amendment was accomplished on July 27, 1979, when the term of the contract was extended to May 1, 1994, and the negotiated contract price was redetermined using Section 103 of the Natural Gas Policy Act of 1978 (NGPA) as a pricing mechanism. The renegotiated price provision reads as follows:
"3.1 Price: Subject to the provisions of this Article and to the provisions of the General Terms and Conditions attached hereto, the price to be paid by Buyer [LIG] to Seller [Walsh] for gas taken, or required to be paid for when not taken, shall be as follows:
Effective May 1, 1979, the price payable shall be the maximum lawful price established for the month of May, 1979, for gas from new onshore production wells pursuant to Section 103 of the Natural Gas Policy Act of 1978; and
Effective May 1, 1980, the price payable thereafter shall be the maximum lawful price established each month during the term hereof for gas from new onshore production wells pursuant to Section 103 of the Natural Gas Policy Act of 1978."
At the time of this amendment Section 103 of the NGPA provided in pertinent part as follows:
"Sec. 103 * * *
(b) Maximum Lawful Price.
(1) General rule.The maximum lawful price under this section for any month shall be
(A) $1.75 per million Btu's, in the case of April 1977; and
(B) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this paragraph for the preceding month multiplied by the monthly equivalent of the annual inflation adjustment factor applicable for such month.
(2) Production after 1984 from wells 5,000 feet or less in depth.
Effective beginning with the month of January 1985 and in any month thereafter, in the case of any first sale of natural gas which was not committed or dedicated to interstate commerce on April 20, 1977, and which is produced from a new, onshore production well from a completion location located at a depth of 5,000 feet or less, the maximum lawful price under this section for any such natural gas delivered during any month shall be a price which is midway between
(A) the maximum lawful price, per million Btu's, computed for such month under section 102 (relating to new natural gas); and
(B) the maximum lawful price, per million Btu's, computed for such month under paragraph (1)."
LIG paid the contract price provided by NGPA Sec. 103(b)(1) until January 1, 1985. Since then LIG made no payments in accordance with Sec. 103, contending ambiguity of price and unenforceability of the contract. Instead LIG has paid Walsh a price lower than that provided by Sec. 103(b)(1).
Although the original gas contract provided for the appointment of arbitrators to resolve pricing disagreements, LIG refused to appoint an arbitrator. Subsequently, Walsh filed suit on July 12, 1985, seeking a *1285 declaratory judgment: (1) that the gas purchase contract was valid; (2) that the price for gas delivered under the contract after January 1, 1985, was the monthly price set by NGPA Sec. 103(b)(2), or in the alternative that set by NGPA Sec. 103 (b)(1); and, (3) for other additional relief including interest and consequential damages.
LIG answered asserting termination of the gas purchase contract as of January 1, 1985, for lack of a certain price.
Walsh and LIG filed cross-motions for summary judgment and in support of the motions the parties entered into a joint stipulation of facts for the trial court's consideration.
In granting LIG's motion for summary judgment the trial court in its written reasons concluded: (1) the parties could anticipate that the price agreed upon would be renegotiated in 1981 pursuant to a contract clause so providing, and would not anticipate there would be two ceiling prices in 1985; (2) that the "maximum price" referred to in the 1979 contract amendment was equivalent to the "ceiling price" under Sec. 103 in effect at the time of the amendment and not the higher of the two prices enumerated after January 1, 1985; (3) at the time of the 1979 price amendment both parties contemplated only one ceiling price under Sec. 103; and (4) since January 1, 1985, Sec. 103 provides two or three possible prices and therefore the contract is unenforceable because a certain, definite price cannot be ascertained.

STANDARD OF REVIEW
LIG argues that the manifest error rule enunciated in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) and Canter v. Koehring Company, 283 So.2d 716 (La.1973) are applicable to the present case.
The record consists of stipulations and documentary evidence submitted to the trial court; no live testimony was presented. Therefore the manifest error rule is inapplicable. Langford v. Calcasieu Parish Police Jury, 396 So.2d 956 (La.App. 3rd Cir. 1981).

CONTRACT OF SALE
The critical question in this case is whether the gas sale contract became unenforceable after January 1, 1985, because of the lack of a certain, definite price.
The contract of sale is an agreement by which one gives a thing for a price in current money and the other gives the price in order to have the thing itself. LSA-C.C. Art. 2439. Although there must be consent to give and to accept a price, it is not essential that the specific sum of the sales price be stated at the time of contracting. Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171 (La.1980). Where the price may be ascertained by computation of definite facts, the price shall be deemed certain. LSA-C.C. Art. 2464; General Finance Corp. of New Orleans v. Harrell, 188 So.2d 211 (La.App. 1st Cir.1966).
Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. Art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. Art. 2046. When a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. C.C. Art. 2046, comment (b); Pogo Producing Co. v. Sea Robin Pipeline Co., 493 So.2d 909 (La.App. 3rd Cir.1986), writ denied, 497 So.2d 310 (La.1986); Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970). A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. LSA-C.C. Art. 2049. Where a contract is capable of construction in accordance with justice and fair dealing, courts will adopt such construction instead of one entailing loss to a party to the contract. Bonfanti v. Davis, 487 So.2d 165 (La.App. 3rd Cir.1986); Haymon v. Holliday, 405 So.2d 1304 (La.App. 3rd Cir.1981).
In the present case the determination of the enforceability of the contract, vis-a-vis *1286 the specificity of the price of the gas in question, or the lack thereof, rests on the interplay of Paragraph 3.1 of the contract and Sec. 103 of the NGPA of 1978.
The trial court found that because of past experience Walsh and LIG could anticipate the renegotiation of price before January 1, 1985. We disagree with the trial court's conclusion in this regard. Though the trial court did not elaborate, apparently its conclusion was drawn from the fact that the parties renegotiated price twice prior to 1979 and under the terms of the contract the price could have been renegotiated on May 1, 1981. Although either party to the contract could have initiated a price renegotiation on May 1, 1981, such action was not mandated and, on the contrary, is worded only permissively in the contract. Accordingly, nothing supportive of the trial court's conclusion can be drawn from the parties' choice not to demand price renegotiaion on May 1, 1981.
The trial court further held that the parties would not have foreseen in 1979 that there would be two ceiling prices for gas in 1985. Courts will not impute to parties to a contract the use of language without meaning or effect. John Bailey Contractor, Inc. v. State, Through Dept. of Transp. and Development, 439 So.2d 1055 (La.1983) When Walsh and LIG agreed in 1979 on Sec. 103 as the benchmark, it was already provided in that section that a second pricing mechanism for new onshore gas (Sec. 103 [b][2]) would become effective on January 1, 1985. Therefore it is clear that the parties were aware in 1979 of the applicability of Sec. 103 (b)(2) in 1985.
One other factor, overlooked by LIG and the trial court, indicative of the parties' contemplation at the time of contracting that the pricing mechanism would extend beyond 1985 through the end of the contract term is the wording of the pricing amendment itself which reads in pertinent part: "Effective May 1, 1980, the price payable thereafter shall be the maximum lawful price established each month during the term hereof ..." (Emphasis added.) Webster's New World Dictionary defines thereafter as "after that in time or sequence; following that; subsequently." Moreover, the price clause establishes a price for each month during the term of the contract. Accordingly, the explicit language of the contract provides for a price tied to Sec. 103 from 1979 through 1994.
The trial court next found that prior to 1985 there was only one possible price under Sec. 103. We agree. The contract stated that the price would be the maximum lawful price established each month. Establish means "to order, ordain, or appoint... permanently." Although Sec. 103 provided the formula for the possible calculation of more than one price, 18 C.F.R. Ch. 1 Sec. 271.101, a publication of the monthly price of gas under Sec. 103 which utilized the annual inflation adjustment factor, established only one price prior to January 1, 1985. The contract called for an established price, not only the capability to formulate one. Indicative of the parties' understanding in this regard was the acceptance by Walsh of the established Sec. 103(b)(1) price until January 1, 1985. Therefore, as provided by the contract, only one price was established prior to January 1, 1985.
The trial court also concluded that the parties' use of the term, maximum lawful price, in the pricing provision was equivalent to the ceiling price in effect under Sec. 103 at the time of the renegotiation in 1979, and not the highest price established in Sec. 103 after January 1, 1985. We disagree. When informed and experienced parties contract they do not ordinarily bind themselves to unreasonable, absurd, inequitable, or unjust obligations. Oil Field Supply and Scrap Material Co. v. Gifford Hill and Co., 204 La. 929, 16 So.2d 483 (1943). The words of a contract must be given their generally prevailing meaning. LSA-C.C. Art. 2047. Both LIG *1287 and Walsh, sophisticated participants, well versed in petroleum contracting, were readily cognizant that the gas which formed the object of this contract did not qualify for treatment as Sec. 103 gas. Since the contract gas was not Sec. 103 gas, Walsh and LIG simply used Sec. 103 for its price formula. With respect to parties selecting a price formula under Sec. 103 for gas which did not have to qualify as Sec. 103 gas, the respective references in Secs. 103(b)(1) and (b)(2) to maximum legal prices are inapplicable as technical terms, and accordingly the potential of having two maximum legal prices without a basis to conclude which should prevail, is obviated. LIG's attempt to interject that there is yet a third price for gas, namely the deregulated price is misplaced. There is no deregulated price established in Sec. 103. Therefore "maximum" means maximum, i.e., the highest price established for any given month by Sec. 103 whether it be that of subsection (b)(1) or (b)(2).
The law between the parties is the contract. LSA-C.C. Art. 1983; Pogo, supra. The contract at issue is a gas purchase contract expressed in explicit language. The wording of the contract is simple and means simply what it says. Therefore we conclude that LIG is contractually bound by its agreement with Walsh as amended by the parties on July 27, 1979, at the maximum lawful price pursuant to Sec. 103.
This case was presented to us in a posture where the trial court granted LIG's motion for summary judgment and denied Walsh's motion for partial summary judgment on the question of the viability of the contract.
Our jurisprudence is entrenched with the sound principle that summary judgment is not a substitute for trial and that it is further inappropriate as a procedural device when affidavits are offered to establish subjective facts such as intent. Mecom v. Mobil Oil Corporation, 299 So.2d 380 (La.App. 3rd Cir.1974), writ denied, 302 So.2d 308 (La.1974). In the present case the parties filed copies of their contracts through the years as well as the correspondence between them relative to the 1979 price renegotiations, and stated in an affidavit to the trial court, "[T]his Stipulation contains all the evidence of the parties' intention and a trial on the merits would not establish any further evidence of the parties' intention." We concluded that as a matter of law the trial court erred in its determination that the contract between Walsh and LIG was not enforceable. Our decision in this regard was premised on the contract itself and did not entail further investigation into extrinsic evidence to establish the subjective question of the intent of the parties. We found that the contract said it all. Accordingly, there being no question of material fact, the trial court was incorrect as a matter of law, and therefore Walsh was entitled to a partial summary judgment for the same reasons relied upon for our reversal of the trial court's decision.
For the foregoing reasons, the judgment of the trial court is reversed and set aside. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that summary judgment in favor of Walsh Brothers-Gahagan, Ltd., Sawyer Drilling & Service, Inc., Succession of John B. Atkins, Harry M. Jarred, Caroline A. Crawford and W.J. Atkins is hereby entered against Louisiana Intrastate Gas Corporation (formerly Celeron Corporation), declaring that the gas purchase contract executed May 1, 1974, as amended, between Walsh Brothers-Gahagan, Ltd., Sawyer Drilling & Service, Inc., Harry M. Jarred, Caroline A. Crawford, John B. Atkins, Jr., and W.J. Atkins, as Seller, and by Louisiana Intrastate Gas Corporation, as Buyer, a valid and enforceable contract. This matter is remanded to the trial court for further proceedings. Costs of this appeal are assessed against Louisiana Intrastate Gas Corporation. The assessment of costs at the trial level are to await a final determination of this matter.
REVERSED AND REMANDED.